**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **LEVI BREWER,** | |
| Plaintiff, | **CIVIL ACTION** |
| | **FILE NO. 4:21-cv-00241-MLB** |
| **v.** | |
| **NORFOLK SOUTHERN RAILWAY COMPANY and JAMES NEESMITH,** | |
| Defendants. | |

## Plaintiff's Response and Objection to Defendants' Motion for Partial Summary Judgment

### 1.    Introduction

Defendants' brief starts with four pages of accusations and not a single citation. This is because its claims and accusations are not supported by the record or the applicable legal authority.

When the court looks at the actual record, it will find:

- There is evidence Brewer acted in good faith and no evidence that would remove the issue from the jury;

- Defendants' backpay argument is a discovery dispute masquerading as a motion for summary judgment; and

- Punitive damages must be decided by a jury.

1

**2.      Facts**

**2.1      General Background**

Plaintiff Levi Brewer began working for Norfolk Southern in 2008, in Chicago. Brewer Dep. 51:5-7 (Excerpts, Ex. 1) He was promoted to a conductor position in 2010. Brewer Dep. 51:13-16; 52:14-17; 53:1-11. Around 2016-2017 he transferred to the Atlanta Division when his family moved to Georgia. *Id.* at 54:6-13; 83:3-12.

**2.2      Norfolk Southern puts Mr. Brewer in a van with a bad tire.**

On July 26, 2020, Mr. Brewer was working as a conductor for Norfolk Southern. Brewer Dec. ¶ 2 (Ex. 2). He and his engineer built a train to take to Chattanooga. *Id.* They worked their way north to Rome, Georgia and had been working for somewhere around ten and half hours when they were told they would switch out with another crew before they got to Chattanooga. *Id.*

Norfolk Southern contracts with a company called PTI to haul crews on behalf of Norfolk Southern. Hairston Dep. 24:24-25:19 (Excerpts, Ex. 3); NeeSmith Dep. 6:25-7:3 (Excerpts, Ex. 4); Sandoval Dep. 25:15-26:25 (Excerpts, Ex. 5). A PTI van came to pick up Mr. Brewer and his engineer, but it had a defective tire. Mr. Brewer explained:

> . . .We waited, I think, just five minutes or so. And a PTI vehicle showed up with another crew inside. We got off the engine, got into the PTI vehicle to proceed the rest of the way to Chattanooga for rest. Once in the vehicle we maneuvered our

way onto the expressway and once we hit the expressway, I felt some vibration in the vehicle.

I was sitting in the very far back of the van on the left side, on the driver's side. In front of me, the next row of seats was Mr. Dotson [the engineer], who was sitting on the passenger side. And then the driver and there was an assistant driver trainee, I believe, in the very front. After about 25 minutes into the ride on the expressway, I asked everyone in the van if they feel this vibration. And they said, "Yes, we feel it."

Then shortly after that I started feeling some discomfort in my back. As I begin to shift and try to stretch my leg out, 20 more minutes into the ride, I started getting sciatica pain going down my leg. And I told the driver that he has to pull over. "I can't -- I can't ride in the vehicle vibrating like that any longer." So we pulled over on the side of the road.

Brewer Dep. 151:24-152:23.

The PTI driver told Mr. Brewer that he was aware of the problem with the tire *before* they picked up Mr. Brewer. Brewer Dep. 159:7-23.

## 2.3    James NeeSmith responds to the scene.

After the van pulled over on the side of the road, the engineer, called Norfolk Southern's supervisor James NeeSmith. NeeSmith Dep. 6:2-8. Brewer Dep. 152:24-25. NeeSmith drove to the PTI van to drive Dotson and Brewer to the Norfolk Southern dormitory in Chattanooga.  NeeSmith Dep. 6:19-24; 9:1-7. NeeSmith never got out of his vehicle, but could still see that the rear driver's side tire on the PTI van had a broken belt. NeeSmith Dep. 36:2-10.

## 2.4    The conversation between Brewer and NeeSmith

Mr. Brewer and NeeSmith both testified about their conversation or conversations after NeeSmith came to pick up the crew. Their testimony differs, but not in a way that is material to the narrow issues raised by Defendants' current motion. The testimony of both make it impossible to conclude Brewer was attempting to conceal an injury.

NeeSmith testified about what Mr. Brewer said to him on July 26, 2020:

Q:  Did Mr. Brewer report any discomfort in his back to you?

A:  He stated that he – due to the vibration of the tire, he – he felt discomfort, and – to his back.
. . .

Q:  Mr. Brewer reported to you discomfort, and Mr. Brewer specifically attributed it to having been riding in the van; correct?

A:  He – he stated the discomfort was from the vibration from the van.
. . .

Q.  Do you remember Mr. Brewer telling you that he just wanted to take some, you know, Advil, or Tylenol, or something like that?

A.  He did make mention of that.

Q.  And you understood that to be him telling you that he wanted to take some Advil or Tylenol? It would help with the discomfort in his back that he attributed to the van ride; correct?

A.  Yes.

Q.  So at this point, as you're dropping them off, you're aware that Mr. Brewer had discomfort in his back; correct?

A. A feeling of discomfort, yes.

Q. You're aware that Mr. Brewer attributed this feeling of discomfort in his back to the van ride he had been on with the back tire; correct?

A. Yes.

Q. And you're aware that Mr. Brewer's discomfort in his back was such that he told you he wanted to go take some Advil and try and get some rest so it would feel better; correct?

A. Yes.

NeeSmith Dep. 11:19-22; 12:8-12; 14:8-15:4.

Mr. Brewer testified that:

> I had a conversation with Mr. NeeSmith about my back and, you know, apologized to him for having to come all this way to get us. I let him know that we pulled over because my back was hurting and I said, "You know, I really can't afford any more injuries. You know, I've been back to work six months, hadn't had any issues, and I just, you know, want to play it safe."
>
> After that -- shortly after that -- Mr. Dotson got in the vehicle and we proceeded to go to Chattanooga. I believe I made a comment to Mr. NeeSmith about, you know, "I just want to get to the hotel, take some Advil or aspirin, and lay down and, you know, see how I feel, you know."
> . . .
>
> Q: When Mr. NeeSmith got there, did he ask you if you were all right?
>
> A: He did.
>
> Q: Okay. And what was your response?

A:  I had a conversation with him about "My sciatica had stopped. I feel okay. Some little discomfort in my back." And that I "just wanted to get to the dorm in Chattanooga to get some over-the- counter meds and lay down."

Q:  You told him that you had sciatica?

A:  Yeah, I told him that was the reason why we had to pull over because I was getting some shooting pain down my right leg.

Q:  Do you recall if you used the term "sciatica" or said "shooting pain down your right leg"?

A:  I probably said "shooting pain down the right leg." Because I'm sure a lot of people don't even know what sciatica is, so I'm pretty sure I told him "shooting pain down my right leg."

Q You didn't tell him just "I had some discomfort." You told him you had "shooting pain down your right"?

A: Yeah.
. . .

He asked me how I felt. I told him I had -- yeah, I told him I had "shooting pain. That's why we pulled over." He asked me how I felt and I said, "Well, I got some throbbing, you know, but I just want to get to the dorm and lay down and get some -- get some over-the-counter pain meds so I can lay down."
. . .

Q:  Did you feel like you were reporting an injury to Mr. NeeSmith in that conversation?

A:  I told him my back was hurting, yes.

Q:  But you didn't want to report an injury at that point. Is that right?

A:  I reported the injury at that point. I reported how I felt. I reported what happened at that point to Mr. NeeSmith.

Q: You told Mr. NeeSmith your back was hurting but you didn't tell him "I'm reporting an injury"?

A: I didn't. I didn't use the words, "I'm reporting an injury" but I let him know that the reason why we pulled over was because I was having shooting pain down my leg and it was hurting. He knew that.

Brewer Dep: 154:2-15; 207:20-208:18; 210:10-18; 211; 212:19-212:1; 212:4-13.

### 2.5    Form 22

Defendants' brief makes it sound as though Mr. Brewer was responsible for deciding if he wanted to fill out an injury form and for doing so. This is not what the record shows.

Only supervisors have access to Form 22, and employees have to get the form from a supervisor. Hairston Dep. 17:16-18; Sandoval Dep. 20: 1-2.  Employees like Mr. Brewer do not have access to a Form 22. Hairston Dep. 17:19-21; Sandoval Dep. 20:3-8. It is the supervisor's job to have the employee fill out the Form 22. NeeSmith Dep. 69:5-8 ("Q: Whose responsibility is it to make sure that a form 22 is filled out? A: The officer that it's being reported to.")

Michael Davis is NeeSmith's boss' boss. NeeSmith Dep. 49:22-50:2. Mr. Davis has this to say about Form 22s:

Q:  Are employees given Form 22's to carry with them in case they need one?

A: No, they are not.

Q:  Where do they get a Form 22 from?

A:  The supervisor would provide a form.

Q: Have you ever had an employee just ever come up to you and, you know, turn one in and say, here's my Form 22?

A:  I have not.

**Q: It's generally -- it's -- it -- it's the supervisor's job to ask the employee to fill out the Form 22?**

**A  That is correct.**

Q. And the supervisors are trained that when an employee reports an injury they are supposed to obtain a Form 22 and give that to the employee and say, hey, fill this out?

A:  That's correct.

Dep. of Michael Davis, *McMillon v. Norfolk Southern Railway Co*[1] 55:5-56:1

(Excerpts, Ex. 6).

Brandon Hairston is a Norfolk Southern supervisor. Hariston Dep. 10:16-11:25. Norfolk Southern trained him on how to handle employee reports of incidents, including injuries. Hairston Dep. 17:22-18:15. Based on his training, if an employee reported to him that "some event happened and it's causing them discomfort," he would "have them fill out a Form 22." *Id.* at 16:6-13 and 16:14-25.

---

[1] The deposition is properly considered as it is sworn testimony based upon Mr. Davis' personal knowledge. *See Vondriska v. Cugno,* 368 F. App'x 7, 8-9 (11th Cir. 2010) (deposition testimony met the requirements of affidavit pursuant to Fed. R. Civ. P. 56 in that the testimony was sworn, competent, based upon personal knowledge and set out facts admissible at trial).

Employees do not need to say magic words or the word "injury," supervisors like Hairston just listen to what the employee is telling them. *Id.* at 17:1-8.

### 2.6 Brewer attempts to update NeeSmith. NeeSmith ignores him.

The next day after the van ride, Brewer sent a text message to NeeSmith saying "Can you give me a call when you get a chance . . . conductor Levi Brewer I worked the 370 yesterday." Exhibit 7. NeeSmith received the text message when it was sent. NeeSmith Dep. 18:16-17. NeeSmith recognized that Brewer was the conductor who rode in the defective van with the bad tire and reported discomfort and needing to take Tylenol. NeeSmith Dep. 18:18-19:8. Brewer had never texted NeeSmith before and was not an employee who would text NeeSmith in the normal course of operations. NeeSmith Dep. 23:8-15.

NeeSmith was on vacation. *Id.* at 18:5-11. NeeSmith had not told Brewer he would be on vacation. *Id.* at 21:12-19. NeeSmith did not respond, ever. *Id.* at 20:20-23.

NeeSmith did not tell Brewer to contact someone else. *Id.* at 21:2-4. NeeSmith did not ask a fellow supervisor to reach out to Brewer. *Id.* at 21:5-8. Mr. NeeSmith says he did not do so because he was on vacation. NeeSmith Dep. 21:9-11. But Mr. NeeSmith also says that on vacation his normal procedure is to monitor employees because he is "24/7, 365 . . . subject to anything regarding employees and the operation of Norfolk Southern." *Id.* at 81:9-82:3.

NeeSmith, in addition to being familiar with the situation, was the only North End trainmaster Brewer knew. Transcript, p.43, Line 279 (Ex. 8). NeeSmith was also the only North End trainmaster Dotson knew. *Id.* at p. 28, Line 162-164.

### 2.7    Brewer marks off work in an acceptable manner.

Defendants suggest Brewer's marking off of work in the week following the injury was nefarious in some way. It was not. Had NeeSmith called him back, NeeSmith would have know exactly what was going on. Moreover, Hairiston testified that it was perfectly fine for Mr. Brewer, if his back was hurting him, to mark off "sick." Hairston Dep. 51:13-52:19 ("So I told him if . . . if your back doesn't feel right or whatever, like, I'll let you choose how you want to handle it, and whether you want to mark off sick.") *See also* Transcript, at p. 19, Lines 95-97 (NeeSmith saying an employee can't be marked off injured without something from a doctor). The fact that Brewer had a hurt back and a sick child at the same time is not evidence that he did not report the injury in good faith.

### 2.8    The Defendants retaliate against Brewer

On August 13, 2020, NeeSmith sent Brewer a letter bringing disciplinary charges for "conduct unbecoming an employee when you provided false and/or conflicting statements to Brandon Hairston during a conversation on August 3, 2020" and "late reporting of an injury on July 25, 2020." Ex. 9. NeeSmith was told to bring these charges by Norfolk Southern's labor relations department. NeeSmith Dep. 28:21-29:8. Although the charge accused Brewer of lying to Mr.

Hairston, Mr. Brewer had never spoken with Mr. Hairston. NeeSmith Dep. 46:10-13; 70:15-19.

We see Defendants' intentional retaliation against Brewer in the transcript of the disciplinary proceeding. It starts with NeeSmith laying out his charges. Transcript, p. 5-12. At the bottom of page 11 that NeeSmith lies and says "Mr. Brewer had stated that, to Mr. Hairston that he, that he had spoke to me about his injury, which on July 25th the *only* information or the *only* conversation I had with Mr. Brewer was the fact that he stated that he just returned from having a herniated disk I asked him if he was okay. He stated yes." Transcipt, p. 11 (emphasis added).

It was only in questioning from Mr. Brewer's union representatives that NeeSmith admitted that what he described was not the "only" information Brewer shared. Under questioning from Brewer's representatives, NeeSmith admitted that Brewer told him his back was causing discomfort. Transcript, p.13, Line 40 through p. 14, Line 44 and p. 18, Lines 82-83.

NeeSmith brought statements from the people at the scene. They all said Mr. Brewer said his back was hurting. *Id.* at p. 20, Line 103 through p. 21, Line 106.

Neither NeeSmith, nor Norfolk Southern have ever taken any steps to prevent PTI from sending a van with a bad tire again, even though it was a violation of their expectations. NeeSmith Dep. 15:21-16:8; Hairston Dep. 25:20-26:5. Sandoval Dep. 26:8-16.

On September 30, 200, Norfolk Southern terminated Brewer. Letter dated September 30, 2020 (Ex. 10); Brewer Dep. 173:2-4; 286:14-22.

## 3. Argument and Citation of Authority

### 3.1 The Defendants' motion is very narrow.

This Court is well familiar with the Summary Judgment standard of Rule 56. However, it is worth noting that the Defendants' motion is made on very narrow grounds. It raises only three issues. As such, Brewer need not respond by demonstrating every element of his case in this brief. "When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B — a ground the movant might have presented but did not." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989), superseded by statute on other grounds as stated in *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992).

### 3.2 The FRSA – a Background

Although the Defendants' motion is quite narrow, it is perhaps helpful to provide some context of the law under which this case arises. It involves worker protection provisions that were designed to address pervasive problems with the safety culture of the nation's railroads. As one court has explained:

> The 2007 amendments were designed to "enhance administrative and civil remedies for employees and to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers." *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 44 (D.D.C. 2013). Under the amended version of the FRSA, a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such

discrimination is due, in whole or in part, to" a protected activity undertaken by the employee. 49 U.S.C. § 20109(a). The statute designates several protected activities such as informing a railroad of a work-related injury . . .

*Singleton v. Norfolk S. Ry. Co.*, 2023 U.S. Dist. LEXIS 18071, at *11-12 (N.D. Ga. Feb. 3, 2023) (cleaned up).

Brewer claims Defendants violated 49 U.S.C. § 20109 when it terminated him following his report of an on the job injury. *See* Complaint, Doc. 1, *generally* and at ¶¶ 91-99. He also seeks punitive damages as the statute allows. *Id.* at ¶¶100-105.

It is important to note that the FRSA is not analogous to Title VII discrimination claims. They are decided under the "contributing factor" standard.

A contributing factor refers to "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." This standard is "broad and forgiving"; it "was intended to overrule existing case law, which required a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action." *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 639 (10th Cir. 2016). Indeed, the Supreme Court has interpreted similar language to create liability if an employee's conduct causes "even the slightest" influence on her employer's decision. *Yowell v. Admin. Review Bd., U.S. Dep't of Labor*, 993 F.3d 418, 424 (5th Cir. 2021).

*Singleton v. Norfolk S. Ry. Co.*, 2023 U.S. Dist. LEXIS 18071, at *12-14 (N.D. Ga. Feb. 3, 2023)(some citation omitted).

### 3.3    Brewer made a good faith report of an injury.

District courts applying 49 U.S.C. § 20109 have taken different approaches to delineating the requirement that an injury report be made in "good faith." Some

define the question as limited to whether the employee "believed his injury was work related." *Cash v. Norfolk S. Ry. Co.*, 2015 WL 178065, 2015 U.S. Dist. LEXIS 4293, at *28-29 (W.D. Va. Jan. 14, 2015); *Davis v. Union Pac. RR Co.*, 2014 U.S. Dist. LEXIS 101708, 2014 WL 3499228 at *7 (W.D. La. July 14, 2014Ray v. Union Pac. RR. Co., 971 F. Supp. 2d 869, 884 (S.D. Iowa Sept. 13, 2013).

Other Courts consider a two part inquiry, asking if: 1) "the employee [had] a good faith belief that his injury is work-related" and 2) "the employee . . . actually made the injury report itself in good faith." *Lemon v. Norfolk S. Ry. Co.*, 2019 U.S. Dist. LEXIS 146607, at *11 (N.D. Ohio Aug. 28, 2019)(citing *Murphy v. Norfolk S. Ry. Co.*, 2015 WL 914922, at *5 n.3 (S.D. Ohio)(and collecting cases).

This Court need not decide which of the two formulations to follow, as under any formulation, a jury would be reasonable to conclude that Brewer acted in good faith. Brewer believed (and still believes) that the van ride caused the pain and discomfort in his back. Declaration of Brewer, ¶ 4. This belief is certainly reasonable, as Brewer had been doing well prior to the van ride. Brewer Dep. 149:5-12. Once the van stared vibrating on the interstate, he experienced discomfort in his back and then sciatica pain. Brewer Dep. 152:16-23.

In all of his dealings with Norfolk Southern concerning his injury and reporting it, Brewer acted with honesty of purpose, freedom from the intent to defraud and being faithful to my duty or obligation. Declaration of Brewer, ¶ 5. When Mr. Brewer told NeeSmith about the van ride and his back he did not have

any ulterior motive. *Id.* at ¶ 7. Brewer did not conceal anything from NeeSmith on July 26, 2020. *Id.* at ¶ 8.

A reasonable jury could conclude that Brewer reported an on the job injury in good faith to Mr. NeeSmith on July 26, 2020. *See* NeeSmith Dep. 11:19-22; 12:8-12; 14:8-15:4 (Brewer told NeeSmith about discomfort from the van ride that made him want to take advil and rest and see if it got better.); Hairston Dep. 16:21-24 (An employee who reports that some event happened and their back was bothering them is an injury report); Brewer Dep. 211:19-212:1 ("I reported an injury at that point.").

Defendants offer no evidence that Brewer did not report his injury to NeeSmith in good faith. There is no evidence that would permit, much less compel a jury to find that Brewer lied to NeeSmith about his injury, that Brewer had some ulterior motive in telling NeeSmith about the injury, or that Brewer, by reporting the injury, was somehow attempting to hide it.

This is not a case like *Lemon*, where the plaintiff <u>*admitted*</u> he (1.) told a variety of different people a variety of different stories about his injury including about where and how it happened; and (2.) lied to his supervisor about who he told about the injury. 2019 U.S. Dist. LEXIS 146607, at *2-4, 14.

In contrast, Brewer has always been consistent about what caused the injury. Even NeeSmith admits that Brewer "volunteered" and was not "hiding" the information about how the van made him feel and the fact that he had been on

medical leave for his back months before. NeeSmith Dep. 26:21-27:9. *See also Id.* at 26:14-20 ("I had no reason to believe that he was lying. I mean, nothing indicated he was lying. He was just telling me his, you know, his experience.")

This Court's inquiry ends on July 26, 2020, when Brewer engaged in a "good faith" act to "notify, or attempt to notify" Norfolk Southern of a work-related personal injury. 49 U.S.C. § 20109. *Ray v. Union Pacific RR. Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013)("the phrase 'good faith' applies directly to a singular 'act done . . . to notify . . . the railroad . . . of a work-related personal injury.'")

Defendants, in sentences bereft of citation, makes grand accusations that Brewer tried to hide an injury. But the only record evidence it cites are Mr. Brewer's statements that he could not afford to be out of work and had been frustrated with Norfolk Southern's health department[2].

What is missing is *any evidence at all* that these feelings affected Mr. Brewer's *actions*. In fact, Mr. Brewer testified that in his conversations with NeeSmith and

---

[2] The "advocacy" of Defendants' brief outstrips the actual text of the testimony it cites. They claim that Brewer's "overarching concern was that he did not want to be held out of work." Def. Br. at p. 17. But for this claim they cite 8 lines (on page 211) where Brewer says he told NeeSmith he could not afford to be off work financially. He never said his "overarching" concern was not being held out. The word "overarching" does not appear in the 292 pages of Brewer's deposition.

Similarly, Defendants' claim that Brewer worked the next day despite a "lot of concern" about getting on railcars is misleading. Def. Br. p. 17. He was concerned about sciatica pain ("It's the most pain I've been in") not about falling off railcars. *See* Brewer Dep. 218-7-19 and 216:4-217:23.

in the first week after his injury, he was not concerned with the medical department, did not know much about Form 22s, and did have any reason to think the medical department would hold him out. Brewer Dep. 258:12-260:1.

Juries get to use common sense. If Mr. Brewer wanted to hide his injury, he would have not said anything to anyone about it. Only an unreasonable juror could determine that Mr. Brewer method of hiding an injury from Norfolk Southern was by volunteering that he had experienced pain from the van ride, needed over the counter pain pills, and had a prior back condition.

The Defendants' brief seeks summary judgment because Mr. Brewer did not ask for a Form 22. But the record shows that it was the supervisor's job to have him fill one out. Hairston Dep. 17:22-25; Davis Dep. 55:23-56:1.

It is helpful to compare this case to one of the cases the Defendants cite, *Murphy v. Norfolk S. Ry. Co.*, 2015 U.S. Dist. LEXIS 25631, 2015 WL 914922, at *5 n.3 (S.D. Ohio). In *Murphy*, the plaintiff was injured by a chainsaw as a result of violating his job rules. *Id.* at *3. Another employee, who was not a supervisor, reported the injury to a supervisor. *Id.* at 4. The plaintiff then got on the phone and convinced the supervisor to conceal the event. *Id.* Even under these circumstances, the court found summary judgment on "good faith" grounds, though close, was inappropriate. *Id.* at 15-18.

The Defendants argue that Brewer did not comply with Rule 912. But the evidence shows it was the supervisor's job to get him a Form 22 if Norfolk

Southern thought one was needed. And it is undisputed that Brewer attempted to contact NeeSmith the day after the event. NeeSmith Dep. 18:5-17.

But more importantly, the issue raised by the Defendants' motion is whether Brewer engaged in protected activity. And what the statute requires is a "good faith" act to "notify, or attempt to notify" Norfolk Southern of a work-related personal injury. 49 U.S.C. § 20109. The statue does not say that Brewer must prove he complied with Rule 912 to the satisfaction of Norfolk Southern's lawyers. To the contrary:

> [T]he FRSA does not require . . . employees follow any particular reporting regime. The FRSA only requires the employee act in good faith to inform his or her employer of a work-related injury.

*Smith-Bunge v. Wis. Cent., Ltd.*, 60 F. Supp. 3d 1034, 1040 (D. Minn. 2014); *Williams v. Ill. Cent. R.R.*, 2018 U.S. Dist. LEXIS 18106, at *9 (S.D. Miss. Feb. 5, 2018)(same). *See also Burton v. Ill. Cent. R.R. Co.*, 2016 U.S. Dist. LEXIS 7925, at *22 (N.D. Ill. Jan. 25, 2016)("According to Illinois Central, Burton cannot establish good faith because he was injured but did not report his injury for 18 days. But the railroad fails to cite any authority for the proposition that a delay in reporting an injury implicates the FRSA's "good faith" provision. Instead, the relevant inquiry is whether an FRSA plaintiff genuinely believes that the injury being reported was work-related.") *See also Thorstenson v. United States Dep't of Labor,* 831

F. App'x 842, 843 (9th Cir. 2020)(The FRSA is violated when railroads have injury policies that cannot reasonably be complied with.)

The Defendants argue that Brewer told Hairston about his injury for ulterior motives. But this ignores the fact that by the time Brewer talked to Hairston he had already notified Norfolk Southern of his injury. Brewer did not have an ulterior motive when discussing his injury with Hairston. Dec. of Brewer, ¶9.

Norfolk Southern notes that the yard job was strenuous. Def. Br., p. 20. It does not explain how this, as a matter of law means Brewer had an ulterior motive. The Defendants say that Brewer did not seek out Hairston. *Id.* But nothing in Section 20109 requires Brewer to have sought out Hairston in order for his notice (which he had already made to NeeSmith) to be in good faith. *See e.g. Murphy*, 2015 U.S. Dist. LEXIS 25631 *4 (no lack of good faith as matter of law where notification of injury came from another employee).

The Defendants claim that Brewer told Hairston about his injury to avoid discipline for attendance. There is no direct evidence of this. There is no evidence that Brewer was concerned about discipline for attendance. To say that Brewer was concerned about discipline for his attendance presumes that Norfolk Southern would punish Brewer for missing work as a result of the injury.

If we look at the documents cited by the Defendants, we see that in March, Mr. Hairston sent Mr. Brewer a "Letter of Caution." (Ex. 11) Per that letter, the next step in any attendance issue would only be a Letter of Reprimand. *Id.* There is a

logical incongruity in the Defendants telling us that Brewer was desperate to avoid reporting an injury because of his fear of the medical department, but then reported an injury so he could avoid a letter of reprimand.

Hairston himself testified that Brewer was "forthright" and "professional" during the interaction. Hairston Dep. 38:5-39:19; 65:22-66:4. The only thing Hairston had trouble believing was that NeeSmith, having had the initial report of injury, would not have done more with it. But Hairston's surprise at NeeSmith's failure to do his job does not impute an ulterior motive to Brewer. *See* Hairston Dep. 16:6-13; NeeSmith Dep. 14:12-15:4. *See also* NeeSmith Dep. 47:15-49:9 (everything Brewer put on his Form 22 was "a hundred percent correct.")

**3.4      The Defendants' backpay argument seeks an unwarranted sanction.**

The Defendants' brief wrongly implies that Brewer bears the burden of showing mitigating wages. This is patently wrong. In awarding back pay or damages, it is well established across various contexts that the defendant bears the burden of showing the amount of any mitigating wages and/or any failure to mitigate. Once a plaintiff makes a showing that they are entitled to damages resulting from the discriminatory acts of an employer, the burden shifts to the employer to prove that the claimant is not entitled to the full amount of back pay sought. *Brown v. Alabama Dept. Of Transp.*, 597 F.3d 1160, 1183 (11th Cir. 2010). The defendant's burden can be met by the production of evidence establishing the

amount of interim earnings received by the claimant, or through evidence showing that the claimant failed to exercise diligence in searching for or retaining interim employment. *Nord*, 758 F.2d at 1470. *See also Fresquez v. BNSF Ry. Co.*, 2020 U.S. Dist. LEXIS 65058, at *3-4 (D. Colo. Apr. 14, 2020)(Defendant has burden of showing failure to mitigate); *Wooten v. BNSF Ry. Co.*, 2018 U.S. Dist. LEXIS 89267, at *15 (D. Mont. May 29, 2018)(same); *Marks v. Prattco, Inc.*, 633 F.2d 1122, 1125 (5th Cir. 1981); *NLRB v. Mooney Aircraft, Inc.*, 366 F.2d 809, 812-13 (5th Cir. 1966).

The Defendants first argue that Brewer cannot recover backpay because he has not yet filed his tax returns for 2020-2022[3]. Essentially, they seek to sanction him for not *creating* evidence. There is no authority for this. *See e.g. Pena v. Bi-Lo Holdings, LLC*, 304 So. 3d 1254, 1258 (Fla. Dist. Ct. App. 2020)("existing spoliation jurisprudence does not sanction punishment for the failure to create evidence.")

Moreover, the only thing shown in a tax return is what income is reported to the government. A tax return is not itself evidence of the presence or absence of any interim earnings. Thus, while a tax return may be discoverable, it is neither the only way nor the best way to determine interim earnings.

The Defendants' second argument is largely just more personal insults. An April 29, 2022 discovery response Brewer said he made $14.50 at Lowe's. Doc. 67-3, p. 12. At his deposition he testified that he "ended up" making closer to $17 an

---

[3] He has produced his 2019 return.

hour. Brewer Dep. 275:5-10. His wife thought he was making $17 or $18 or $20 an hour in 2023. Kimberly Brewer Dep. 27:1-2 and 15-24. Of course, the best record of Brewer's earnings at Lowes would come from Lowe's itself. The Defendants served a subpoena on Lowe's for Brewer's "compensation records" and "W-2 forms." Doc. 40, p. 7. Brewer did not object. The documents Lowe's produced would be the most reliable evidence of Brewer's Lowe's earnings.

With respect to "Rent the Event" and his DJ work, Brewer testified that he has not made a profit from this business. Brewer Dep. 55:14-56:5. His wife said that since 2020 they have rented party supplies about seven to eight times, never for more than $300. Kimberly Brewer Dep. 13:16-14:9. Since 2020, Brewer has DJ'd three times at a rate of $75/hour. *Id.* at 16:3-10.

Brewer testified he has done maybe four of five "odd jobs" for friends since 2020 and was paid $1,500 for the biggest one. Brewer Dep. 67:6-15; 282:23-284:1. With respect to these odd jobs for friends, all of them are things he could have done while still working for Norfolk Southern. Declaration of Brewer, ¶ 15. The "fired insurance" is just that – insurance, a collateral source that is not offsetting.

At worst, Brewer needs update his discovery responses. But none of this small time DJ'ing or odd jobs or wage creep at Lowe's justifies sanctioning Brewer by striking his claim for backpay. Defendants offer no authority in support of this proposition. In fact, the cases they do cite involve sanctions for egregious discovery misconduct. In *Benson v. Thompson-Cadillac* involves a long history of

discovery abuse and disobeying court orders. Even then, the court did not sanction the plaintiff by denying all backpay. In *Fik-Rymarkiewicz*, "the plaintiff demonstrated contumacious behavior, ignored court orders, and obstructed discovery." *Fik-Rymarkiewicz v. Univ. of Med. & Dentistry of N.J.*, 430 N.J. Super. 469, 471, 65 A.3d 836, 837 (Super. Ct. App. Div. 2013). In *American Navigation Co.*, 268 N.L.R.B. 426, 428 (N.L.R.B. December 20, 1983), the Labor Relations Board announced it will limit backpay when claimants "willfully deceive the Board and not where the claimant, through inadvertence, fails to report earnings."

Here, Defendant has not made any good faith effort with respect to any discovery dispute or followed this Court's process for discovery disputes. They have not shown any willful misconduct, obstruction, or failure to obey orders by the Brewer. Striking Brewer's claim for backpay may not be granted.

**3.5     Punitive Damages should be decided by the jury.**

Courts in this Circuit have found that punitive damages are available where "a railroad acted 'with malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law.'" *Singleton v. Norfolk S. Ry. Co.*, 2023 U.S. Dist. LEXIS 18071, at *37-38 (N.D. Ga. Feb. 3, 2023)(quoting *Pan Am Rys., Inc. v. U.S. Dep't of Labor*, 855 F.3d 29, 38 (1st Cir. 2017). *See also Brown v. Cent. of Ga. R.R.*, 2023 U.S. Dist. LEXIS 200277, at *17 (M.D. Ga. Nov. 7, 2023)("Punitive damages are available

for violations of the FRSA that are intentional or done with a reckless or callous disregard for an employee's rights under the FRSA")

Punitive damages under 49 U.S.C. § 20109 are not governed by the statutory provisions of Title VII or by the case Defendant cites applying Florida tort law. *See* Def. Br, p. 24, citing *Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260 (S.D. Fla. 2020). Defendant offers no authority for incorporating Eleventh Circuit Title VII jurisprudence on punitive damages into this case[4].

District courts in this Circuit generally permit such questions to go to the jury. Here, the evidence shows that NeeSmith is aware that federal law prohibits retaliating against employees for on the job injuries. NeeSmith Dep. 83:9-83:23. But NeeSmith carried out instructions from the law department to bring charges against Brewer and did so in concert with his boss, Mr. Mosley. NeeSmith Dep. 27:16-28:20 ("We . . . brought charges [referring to him and Mr. Mosley].")

A jury could infer NeeSmith's motives from the fact that he failed to respond to Brewer's text despite his contention that he monitors employees on vacation and is available 24/7, 465. Or from NeeSmith's conduct at the investigation, when he initially omitted the fact that Brewer reported discomfort and needing to take

---

[4] And although a panel of the Eleventh Circuit had held it is bound by the *Dudley v. Wal-Mart* case, *EEOC v. Exel, Inc.*, 884 F.3d 1326, 1332 (11th Cir. 2018) the decision is clearly at odds with the Supreme Court's decision in *Kolstad. See Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 265 (6th Cir. 2001).

Tylenol. A jury could infer bad intent from NeeSmith bringing terminable offense charges based on alleged false statements Brewer made to Mr. Hairston, when NeeSmith had never even spoken about the conversation with either Brewer or Hairston[5]. NeeSmith Dep at 73:10-13.

We also see that NeeSmith included false information in his internal write-up of the event. NeeSmith Dep. 42:6-43:15. And that NeeSmith has offered conflicting testimony. *Compare* NeeSmith Dep. 53:23-56:1 (going back and forth on needing medical care being the difference between an injury and non-injury) *with* Hairston Dep. 21:17-20 (scraped knees are considered injuries).

Finally, although NeeSmith is aware of anti-retaliation protections, he is not aware of any supervisor at Norfolk Souther who has ever been counseled of disciplined for violating them. NeeSmith Dep. 84:12-18.

### 4.    Conclusion

All three of the issues raised by Defendants in its summary judgment motion must be denied. A reasonable jury could conclude that Brewer reported an on the job injury in good faith and that punitive damages are appropriate. And no showing has been made that comes close to justifying any sanction at all, much less striking Brewer's backpay claim.

---

[5] This is particularly egregious given that NeeSmith admits that the written document and statement Brewer prepared at Hairston's request was 100 percent accurate. NeeSmith Dep. 48:21-23; 49:6-9.

Respectfully submitted this 11th day of January, 2024.

/s/ Trent Shuping
Trent Shuping
Georgia Bar No. 159083
Warshauer Woodward Atkins, LLC
2740 Bert Adams Road
Atlanta, GA 30339
Telephone: 404-892-4900
tss@warlawgroup.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE AND
## COMPLIANCE WITH LOCAL RULE 5.1

I hereby certify that the foregoing document was prepared in Book Antiqua 13 Point Font as allowed by Local Rule 5.1 and further certify that I have this day served a copy of the within and foregoing upon all parties to this matter via the CM/ECF system.

This 11th day of January, 2024.

By: */s/ Trent Shuping*
Trent Shuping

Warshauer Woodward Atkins, LLC
2740 Bert Adams Road
Atlanta, GA 30339
404-892-4900
470-613-6881 Fax
*Attorneys for Plaintiff*